# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUSSELL HUNTER, Individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>BLUE RIDGE BANKSHARES, INC., BRIAN K. PLUM, JUDY C. GAVANT, AND ANDREW H. MOSER,<br><br>      Defendants. | Case No. 1:23-cv-08944-DG-JAM<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

## TABLE OF CONTENTS

I.    NATURE OF THE CASE ............................................................................. 1

II.   JURISDICTION AND VENUE .................................................................. 5

III.  PARTIES AND IMPORTANT NON-PARTIES ....................................... 6

   A.   Parties ................................................................................................. 6

   B.   Important Non-Parties ....................................................................... 7

IV.  BLUE RIDGE'S 2022 10-K MATERIALLY UNDERSTATED TDRS, NONACCRUAL LOANS, AND ALLOWANCE FOR LOAN LOSSES, AND OVERSTATED NET INCOME ................................................................... 8

V.   BLUE RIDGE MISSTATED THE STATUS OF TWO GIANT LOANS ISSUED BY DEFENDANT MOSER ..................................................................... 8

   A.   Blue Ridge Is a Small Regional Community Bank ........................... 8

   B.   Blue Ridge Hires Moser As Chief Lending Officer ....................... 9

   C.   Moser Approves a $37.5 Million Loan to a Troubled Esports Company and Then Extends the Loan Because the Borrower Is Unable To Repay ................................. 13

      1.   *Moser approves the ReKT loan* ................................................... 13

      2.   *Blue Ridge extends the ReKT loan because ReKT can't repay it* ................................ 15

   D.   A $23.7 Million Loan Moser Issues to Failing Colleges Immediately Goes Bad ..... 18

      1.   *Moser Issues a $23.7 Million Loan to Troubled Educational Institutions* .................. 18

      2.   *Blue Ridge Attempts to Sell the Colbeck Loan at a Loss; an Internal Investigation Uncovers that Moser Engaged In Misconduct In Connection With the Colbeck Loan* ....................................................................... 21

   E.   Blue Ridge Understated Both Its Nonaccrual and Impaired Loans ........................ 23

   F.   Blue Ridge Understated Its Allowance for Loan Losses and Overstated Its Net Income Because It Did Not Record A Provision For the Colbeck Loan ................... 26

   G.   Defendants' False Statements Were Quantitatively and Qualitatively Material ..... 28

VI.  DEFENDANTS' SPECIFIC ACTIONABLE STATEMENTS AND OMISSIONS.... 30

i

**VII. LOSS CAUSATION** ................................................................................................ 33

**VIII. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER** ........................ 35

   **A.** **Moser Engaged In Deliberate Misconduct** .................................................... 35

   **B.** **Blue Ridge Fires Plum and Moser** .................................................................. 36

   **C.** **Commercial and Industrial Loans Were Blue Ridge's Fastest-Growing Category of Loans Part of Blue Ridge's Portfolio; Issuing the ReKT and Colbeck Loans Violated Blue Ridge's Stated Policy.** .................................................................................. 36

   **D.** **Defendants Regularly Boasted of Blue Ridge's Ratio of Nonperforming Assets to Total Assets** ....................................................................................................... 37

   **E.** **Defendants Were Personally Involved in the ReKT and Colbeck Loans** ................ 38

   **F.** **The Timing of the Extension of the ReKT Loan Supports Scienter** ........................ 38

   **G.** **Plum and Gavant Were Experienced Accounting Professionals** .............................. 39

   **H.** **Recognizing the ReKT and Colbeck Loans as Nonaccrual Would Have Brought Blue Ridge Close to Breaching Regulatory Capital Requirements** ..................................... 39

   **I.** **The ReKT and Colbeck Loans Were Large and Atypical** ........................................ 41

**IX. DEFENDANTS' SCIENTER IS IMPUTED TO BLUE RIDGE** .................................. 42

**PLAINTIFF'S CLASS ACTION ALLEGATIONS** ............................................................ 43

**PRESUMPTION OF RELIANCE** ....................................................................................... 45

   **COUNT I** ............................................................................................................... 47

   **COUNT II** .............................................................................................................. 49

**PRAYER FOR RELIEF** ...................................................................................................... 50

Lead Plaintiff Russell L. Hunter ("Plaintiff"), individually and on behalf of all persons similarly situated, by his undersigned attorneys, for his Amended Complaint against Defendants Blue Ridge Bankshares, Inc. ("Blue Ridge" or the "Company"), Brian K. Plum, Andrew H. Moser, and Judy C. Gavant ("Individual Defendants" and with Blue Ridge, "Defendants") allege the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters.

## I.    NATURE OF THE CASE

1.    This is a federal securities class action on behalf of a class consisting of all persons who purchased the publicly traded Blue Ridge common stock between February 3, 2023, and October 31, 2023, both dates inclusive (the "Class Period"), and held the stock through at least one of the corrective disclosures identified in ¶¶119-126 herein, seeking money damages under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    A banking industry witticism has it that "a rolling loan gathers no loss." To prevent banks from presenting misleading financial statements, accounting rules require that if a bank extends a loan date *because* a counterparty is unable to repay, then the bank must record the amount of the loan in its financial statements as troubled debt restructuring ("TDR") and nonaccrual loans (loans the bank expects will not be repaid in full). Reasonable investors understand these disclosures as a warning to expect significant losses in the future. In his short but disastrous tenure, Blue Ridge's Chief Lending Officer ("CLO") Andrew Moser made a series of ill-advised loans. The two largest were a giant $37.5 million loan to Esports company ReKTGlobal and another $23.7 million loan to nominally not-for-profit educational institutions run by a for-profit hedge fund, Colbeck Capital. Within months, Blue Ridge determined that neither of these borrowers could repay their loans according to their terms. Though Moser, with

CEO and Defendant Brian Plum's knowledge and consent, extended the ReKT loan and tried to sell the Colbeck Loan to Colbeck Capital at a loss, Blue Ridge failed to recognize either as nonaccrual in its 10-K. So by "rolling" the loans, Defendants misleadingly prevented Blue Ridge Bank from recognizing a "loss," violating Generally Accepted Accounting Principles ("GAAP"). When Blue Ridge Bank recognized the loans as nonaccrual in Q1 and Q2, 2023, its stock price fell. Blue Ridge's stock price fell again when it announced it was restating its financial statements because it should have recorded the loans as nonaccrual in its 2022 10-K.

3. Blue Ridge Bankshares (occasionally referred to as "Holding") is a bank holding company operating through Blue Ridge Bank, NA (occasionally referred to as "Bank"). Blue Ridge primarily operates in Virginia.

4. In or around June 2022, Blue Ridge hired one of its former compliance training consultants, Moser, to serve as its Chief Lending Officer ("CLO"). Moser was a rather unusual choice. Just seven years before, he had run a hedge fund he co-founded into the ground by recklessly extending a giant loan to a doubtful borrower. After his dismissal, the fund uncovered that he had stolen money from the fund and committed fraud to conceal the theft. After losing two more high-profile lending positions once his prior misconduct was revealed, he largely disappeared from public view, except for the fund's periodic attempts to collect the $2.4 million he owed it.

5. Upon his elevation to CLO, Moser extended, and Defendant Plum authorized, two large loans, amounting to approximately $60 million—***nearly 2.0% of Blue Ridge's total assets.*** The first was a July 2022 $37.5 million six-month bridge loan to an Esports company with tiny revenues, ReKTGlobal, Inc. The second was an August 2022 $23.7 million letter of credit Blue Ridge issued to two nominally not-for-profit institutions, South University and The Arts Institutes,

run by a for-profit hedge fund, Colbeck Capital ("Colbeck Loan"). The two loans were nothing like the local community real estate-backed or business loans that Blue Ridge was equipped to underwrite and issue. By the end of the year, Blue Ridge had already decided that it would not recover the principal and interest on either loan. In violation of GAAP, it failed to properly account for these failing loans.

6.      Within weeks of the ReKT loan, a former ReKT investor sued ReKT, demanding tens of millions of dollars. In response, as alleged in the investor's November 2022 lawsuit, ReKT exercised a contractual clause that allowed it not to pay the investor because neither it nor its parent had any money. Because ReKT did not have the ability to pay Blue Ridge, either, Blue Ridge extended the 6-month loan by 13 months, filing a barrage of UCC liens on ReKT's assets just as 2022 ended.

7.      Blue Ridge issued the Colbeck Loan to the Colbeck Foundation (renamed the Education Principle Foundation to conceal its connection to Colbeck), the parent of two educational institutions, South University and The Arts Institutes. The Colbeck Loan was high risk and structurally problematic. It came little more than a month after the U.S. Department of Education and a certified class of students reached a settlement identifying both South University and The Arts Institutes as colleges whose students would not have to repay federal loans because the schools used pervasive fraud in recruitment. Moreover, collectability was doubtful because Colbeck Foundation's affiliate, hedge fund Colbeck Capital, was systematically stripping the colleges of their cash. Within months of issuance, Moser and Plum were scrambling to convince Colbeck Capital to buy out the Colbeck Loan at a significant loss to Blue Ridge.

8.      Accounting and regulatory rules require that Blue Ridge accurately disclose the status of the loans in its financial statements. When a bank offers a borrower amended terms it

would not consider but for the borrower's financial condition—as Blue Ridge did to ReKT—the bank must disclose the loan as a troubled debt restructuring ("TDR") in its financial statements. And Blue Ridge had to account for all TDRs *and* loans on which it did not expect to collect the full principal and interest—including the Colbeck Loan—as nonaccrual loans. By failing to do so in Blue Ridge's 2022 10-K, Defendants understated its TDRs by 97% and its nonaccrual loans by 86%, as Blue Ridge later admitted when it restated the 2022 10-K. By understating the amount of its problem loans, Blue Ridge fraudulently concealed from investors that its losses from bad debt were about to skyrocket, setting the investors up for losses in the likely event that Blue Ridge would have to recognize the loans as nonaccrual, record impairments, or even write them off entirely.

9.     Defendants knew about the ReKT loan and the Colbeck Loan and knew Blue Ridge had to recognize them as nonaccrual. Blue Ridge's Board of Directors ordered an internal investigation of the Colbeck Loan and Blue Ridge's relationship with Colbeck Capital. The investigation was completed before the beginning of the Class Period. Its results were so dire that Moser called one investigator—on a Sunday—to demand the investigator not put any of their findings (or anything else) in writing. And a Board-level risk committee discussed the ReKT loan at length and requested an outside opinion on the loan. The opinion, also delivered before the beginning of the Class Period—"you guys are in something it's not your business being in"—was hardly reassuring.

10.     By deferring the recognition of the bad loans, Defendants temporarily artificially inflated Blue Ridge's stock price. Had Blue Ridge recognized the bad loans in its original 2022 10-K, as it was required to, its stock price would have fallen to reflect the bad news. But deferring recognition did not make the problem loans go away. In announcing Q1 (amidst firing Moser)

and Q2 2023 results (after firing Plum), Blue Ridge was forced to reclassify the ReKT loan and Colbeck Loan as nonaccrual, causing its stock price to fall. Blue Ridge's stock price fell even further when, in October 2023, Blue Ridge restated its 2022 10-K. Investors who purchased the stock during the Class Period at artificially inflated prices suffered damages from Defendants' fraud.

## II.    JURISDICTION AND VENUE

11.    The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

14.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Blue Ridge common stock in this District.

### III.    PARTIES AND IMPORTANT NON-PARTIES

#### A.    Parties

15.    Plaintiff Russell Hunter as set forth in the certification previously filed and incorporated by reference herein (Dkt. No. 10-2), purchased Blue Ridge stock at artificially inflated prices during the Class Period and suffered damages thereby.

16.    Defendant Blue Ridge is a Virginia corporation with principal executive offices located at 1807 Seminole Trail, Charlottesville, Virginia 22901. Blue Ridge's common stock trades on the NYSE American Exchange ("NYSE Amex") under the ticker symbol "BRBS". References to "Blue Ridge" are to Blue Ridge with all its subsidiaries.

17.    Defendant Brian K. Plum served as the Company's Chief Executive Officer and President of Blue Ridge's operating subsidiary Blue Ridge Bank NA (occasionally, "Bank") from December 2014 through May 7, 2023, when he resigned these positions effective immediately. Plum served as Blue Ridge Bankshares, Inc.'s (occasionally, "Holding") CEO from December 2014 through July 12, 2023, when he resigned this position, effective immediately. Plum served as Bank's Executive Vice-President & Chief Administrator from February 2014 to December 2014, and as Bank's Executive Vice-President & Chief Financial Officer from August 2006 through January 2014. Plum is a CPA and worked as an accountant before joining Blue Ridge.

18.    Defendant Andrew H. Moser served as Bank's Executive Vice President—Chief Lending Officer from June 2022 through at least March 2023. Before that, Moser served as Executive Vice President—National Specialized Lending.

19.    Defendant Judy C. Gavant has served as Holding's Chief Financial Officer and Executive Vice President since January 2021, and Bank's president since April 20, 2022. From May 2018 through January 2021, she served as EVP & Chief Financial Officer of Virginia Commonwealth Bank, which then merged into Blue Ridge. From August 2010 through March

2018, Gavant served as SVP, Controller, and Chief Accounting Officer of Xenith Bank. Gavant is a CPA and worked for accounting firm PwC for nine years.

## B.    Important Non-Parties

20.    RektGlobal, LLC f/k/a REKTGlobal Inc. ("ReKT"), is an Esports and entertainment company. On July 5, 2022 ReKT announced it would be acquired by Infite Reality, Inc., another obscure Esports company.

21.    Colbeck Capital Management ("Colbeck") is a middle-market private credit manager headquartered in New York State. In 2019, through its non-profit subsidiary Education Principle Foundation f/k/a the Colbeck Foundation ("Colbeck Foundation"), Colbeck acquired two multi-campus nominally not-for-profit colleges, South University and The Arts Institutes.

22.    Former Employee 1 ("FE 1") was a Senior Vice President, Fund Finance & Middle Markets from September 2022 to March 2023. During their tenure, FE1 was responsible for managing middle-market relationships and running a "fund finance book of business." FE1's boss answered to Doug Riddle, then Vice President at Blue Ridge, now EVP—Commercial Banking Executive at Blue Ridge.

23.    Former Employee 2 ("FE 2") was employed at Blue Ridge between December 2013 and January 2023. FE 2 served as Blue Ridge's Chief Risk Officer until about June 2021, when they requested to be demoted to Director of Enterprise Risk Management because they were concerned with the complexity of Blue Ridge's operations. In this latter role, they oversaw a team that handled compliance, risk management, and internal audit. FE 2 reported to the Chief Risk Officer Tana Rugel, who in turn reported to the Audit Committee and the CEO.

24.    Former Employee 3 ("FE 3") was a Vice President—Commercial Lender I from July 2021 to February 2024. FE 3 worked out of a Blue Ridge bank branch and serviced the local

area. FE 3 reported to Regional President Ed Putney, who had reported to then-Chief Lending Officer Dusty Boyd before his June 2022 termination and Moser thereafter.

## IV.   BLUE RIDGE'S 2022 10-K MATERIALLY UNDERSTATED TDRS, NONACCRUAL LOANS, AND ALLOWANCE FOR LOAN LOSSES, AND OVERSTATED NET INCOME

25.     On October 31, 2023, Blue Ridge filed a Form 8-K to notify investors that they should no longer rely on its previously-filed 2022 10-K ("Original 2022 10-K"). On November 14, 2023, Blue Ridge filed a restated 2022 10-K ("Restated 2022 10-K"). The Restated 2022 10-K revealed that Blue Ridge had misstated critical metrics of loan quality: the dollar value of loans that are nonaccrual, impaired, or in troubled debt restructurings (commonly referred to as TDRs), and, as a result, its allowance for loan losses and net income.

|  | As originally stated | As restated | Amount overstated or (understated), in dollars | Amount understated or overstated, in % |
|---|---|---|---|---|
| TDRs | $1.1 mln | $38.3 mln | ($37.3 mln) | 97% |
| Nonaccrual | $10.3 mln | $76.0 mln | ($65.7 mln) | 86% |
| Impaired | $45.2 mln | $73.7 mln | ($28.5 mln) | 39% |
| Allowance for Loan Losses | $22.9 mln | $30.7 mln | ($7.8 mln) | 39% |
| Net income (FY 2022) | $27.6 mln | $17.0 mln | $10.6 mln | 62% |
| Net income (Q4 2022) | $6.3 mln | ($4.3 mln) | $10.6 mln | 247% |

## V.   BLUE RIDGE MISSTATED THE STATUS OF TWO GIANT LOANS ISSUED BY DEFENDANT MOSER

### A.   Blue Ridge Is a Small Regional Community Bank

26.     Blue Ridge is a small regional community bank doing business in Virginia and through a few branches in North Carolina. As of the beginning of the Class Period, Blue Ridge was only the fourth-largest community bank in Virginia by market share.

27.    Blue Ridge's balance sheet was small and typical of regional banks. As of December 31, 2022—the last quarter before the Class Period begins—Blue Ridge had total assets of $3.1 billion and total liabilities of $2.9 billion.  Of Blue Ridge's total loans held for investment ($2.4 billion), 71.1% ($1.7 bln) consisted of real estate-backed loans.

28.    Blue Ridge also held about $590 million in commercial and industrial loans, or 24.6% of its total assets, a significant increase from 17.8% the year before and just 9.4% as of December 31, 2020. According to Blue Ridge's 2022 10-K, these consisted of "business loans, asset-based loans, and other secured and unsecured loans and lines of credit." As Blue Ridge recognized, these "loans may entail greater risk than residential mortgage loans, and therefore are underwritten in accordance with strict risk management standards." The "criteria for determining the borrower's ability to repay [include] a cash flow analysis of the business and business collateral."

### B.    Blue Ridge Hires Moser As Chief Lending Officer

29.    In August 2022, Blue Ridge entered into a consent decree with the Office of the Comptroller of the Currency ("OCC"), its regulator.

30.    According to FE 2, in preparation for the consent decree, Blue Ridge retained the services of Strategic Risk Associates. One of Strategic Risk Associate's employees, Moser, worked for Blue Ridge as a compliance training consultant for a few months. Blue Ridge then hired Moser to work in Blue Ridge's FinTech line of business. Corroborating FE 2's account, Blue Ridge's contemporaneous public statements confirm that as of at least June 13, 2022, Moser served as Executive Vice President—National Specialized Lending. Further corroborating FE 2's account, Moser claims on his LinkedIn account that he joined Blue Ridge Bank in February 2022.

31.    According to FE 2, when Blue Ridge fired its Chief Lending Officer, effective June 27, 2022, Moser got the job.

32.     As set out in public records, Moser was an odd choice. He had previously caused his prior employer's collapse by extending reckless loans. He had also stolen from the same prior employer. Thereafter, Moser lost two other positions when it was revealed that he concealed these facts from his employers. The facts set forth below became public once his initial employer filed to confirm the arbitration award in court in 2017.

33.     Moser co-founded Salus Capital as a financial subsidiary of a larger holding company, HRG Group. HRG Group owned 80% of Salus, leaving its other owners, including Moser, with 20%. Salus extended asset-backed loans to middle-market companies experiencing difficulties. According to HRG Group's 10-K for the year ended September 30, 2013, the loans Salus extended ranged from $5-50 million. It had outstanding funded loans totaling $565.6 million.

34.     In December 2013, Salus issued a $250 million loan to RadioShack. RadioShack filed for bankruptcy in early 2015. In March 2015, HRG Group announced that it would wind Salus Capital down, starting by limiting its operations to servicing existing loans rather than issuing new ones. In the year ended September 30, 2015, HRG Group recognized a $101.0 million impairment from the RadioShack loan and an additional provision for credit losses of $24.8 million from other Salus loans. These allowances, by themselves, accounted for more than 20% of the conglomerate's losses that year.

35.     Salus also discovered and proved that Moser had misused company property. Salus Capital alleged in an arbitration that Moser had stolen money from it and created fake invoices to conceal his theft. Moser's own publicly-filed emails made it obvious that he was using company resources for his own benefit and forging documents to conceal his crime. For instance, Moser

stated in emails to a contractor who was building a personal entertainment system at his primary residence:

> Let's figure out how to break out all the work and get started? I need "work invoices" [quotation marks in original] in (3) when we start. Priority start for me are:
> - My upstairs Master
> - Wireless Upgrade
> - Nest
> - Game Room
>
>         *        *        *        *
>
> If we can work these invoices so that I can hit the corporate Amex once per month starting in January and keep invoices below 25K each then that can work for me best, let me know?
>
>         *        *        *        *
>
> I'm wondering if we attack this by room so the splits are smaller? 46K for equipment is more than I wanted to do in one invoice. What's your schedule in starting work?

36.     The arbitrator agreed with Salus, making specific findings that: (a) Moser had properly been fired for cause, (b) Moser had misappropriated company funds, (c) Moser had directed a contractor to falsify invoices to make the contractor's expenses appear to be customer-related, and (d) Moser's conduct amounted to actual fraud.

37.     The arbitrator awarded Salus Capital Partners $2.6 million. After some additional proceedings, the United States District Court for the Southern District of New York confirmed the arbitral award. On appeal, the parties consented to a judgment of $2.4 million in Salus's favor. Salus continues to attempt to collect on its judgment against Moser. *See, e.g.*, *Salus Capital Partners, LLC v. Moser*, 23-cv-5139-PSG-MAR (C.D. Cal. June 13, 2023); *Salus Capital Partners, LLC v. Moser*, 18-mc-91378-PBS (D. Mass. September 4, 2018); *Salus Capital Partners v. Moser*, CL23000260-0 (Va. Cir. Ct. Page County).

37.     At Blue Ridge, Moser quickly reprised the behavior that had caused Salus's collapse and his own legal troubles.

38.     According to FE 1, when he became CLO, Moser quickly made a "s***load of crazy loans." These loans were all "starting to go bad" in late 2022.

39.     According to FE 1, the loans Moser initiated were classified as Specialty Finance. Technically classified under "commercial and industrial," the specialty finance loans had complex and unorthodox terms and relied on unusual and risky collateral.

40.     Corroborating FE 1's account, Blue Ridge would admit in July 2023 that it had issued a "group of loans, totaling $58.1 million at quarter-end [after some write-offs], [] sourced by a former lender, and [] best described as specialty finance that we deemed to be not in keeping with our desired risk profile." Moser's original title was Executive Vice President—Specialized Lending. Further, according to FE 3, Moser was fired in March 2023, so he was a "former lender" as of July 2023.

41.     According to FE 3, Blue Ridge's loans typically fit the profile of a community bank. Commercial Lenders like FE 3 worked out of branch offices extending and approving loans to their local community. But Moser made loans "outside the bank's footprint" at "almost a national" level.

42.     Two of Moser's loans were particularly problematic. The first, for $37.5 million, was to an Esports company, ReKT. The second was a $23.7 million line of credit extended to a nominal non-profit, Colbeck Foundation, which ran a series of post-secondary education institutions including South University and The Arts Institutes. In total, these loans accounted for 2.0% of Blue Ridge's total assets.

43.     Moser also attempted to personally benefit from his tenure. For example, for at least one loan, instead of relying on Blue Ridge's internal underwriters, Moser hired a friend to draft a 7-page loan memo, paying the friend $30,000.

44.     It was so obvious to Blue Ridge that the loans would incur losses that in late 2022, Blue Ridge stopped issuing specialty finance loans altogether.[1]

### C.     Moser Approves a $37.5 Million Loan to a Troubled Esports Company and Then Extends the Loan Because the Borrower Is Unable To Repay

#### 1.     *Moser approves the ReKT loan*

45.     In 2020, ReKT took out a $35.5 million loan from a hedge fund, Summit Partners ("Summit").

46.     In April 2022, ReKT announced that it would be acquired by Infinite Reality. The acquisition triggered ReKT's obligation to retire the Summit loan. But because the consideration for the acquisition was Infinite Reality stock, not cash, ReKT had no money repay Summit.

47.     On June 29, 2022 Blue Ridge extended ReKT a $37.5 million loan. By its terms, the loan would mature on December 31, 2022, just six months later. *Rektglobal, LLC v. Summit Investors Credit III, LLC*, 0654345/2022, NYSCEF 1, at 12 n.1 (N.Y. Sup.). ReKT only had to pay interest until the loan's maturity, when the full principal came due. ReKT's purpose in seeking the loan was just to stay afloat until ReKT found more permanent and secure financing.

48.     The loan to ReKT was unusually large for Blue Ridge. It amounted to almost 1.3% of Blue Ridge's total portfolio (as of December 31, 2022) and 136% of the 2022 net income it reported in the Original 2022 10-K. It was also outside of Blue Ridge's wheelhouse because it

---

[1] Blue Ridge 2023 10-K, at 44.

was a short-term loan to an Esports company, secured by accounts receivable rather than real estate (according to FE 2), and designed merely to keep ReKT afloat while its finances stabilized.

49.     The loan caused consternation among other Blue Ridge executives and directors. According to FE 2, Blue Ridge had a standing Enterprise Risk Management Committee ("Risk Committee"), which FE 2 ran, and on which Defendants Plum and Gavant sat. The Risk Committee's responsibilities included approving large loans. Yet the day of one of the Risk Committee's monthly meetings, the Risk Committee's Chairman, Vance Spillman, called FE 2 to ask about the ReKT loan. Spillman expressed vexation that he and Blue Ridge's Board had only just heard of the loan and had not been consulted before the loan was issued. The loan was "really big", and the board wanted to know "what was going on." But FE 2 quickly responded that Spillman's call was the first time they had heard of the loan. So, instead of explaining the loan to Spillman, FE 2 asked Spillman for whatever limited information he had about the loan. The meeting and FE 2's call with Spillman took place after the ReKT loan was approved but no later than late October or early November 2022.

50.     According to FE 2, upon discovering the ReKT loan, Blue Ridge retained third-party IntelliCredit to evaluate it. IntelliCredit produced a report which "raised concerns" about the loan. Indeed, IntelliCredit told Blue Ridge "you guys are in something [the ReKT loan] it's not your business being in."

51.     According to FE 2, at some point before the Risk Committee's late November/early December monthly meeting, ReKT requested that Blue Ridge extend the repayment deadline. ReKT's request for an extension was discussed at that meeting, but no decision was reached.

52.     According to FE 2, Moser originated the ReKT loan. Moreover, Plum approved the loan.

53.     According to Blue Ridge's restated Q1 2023 10-Q, in December 2022, Blue Ridge extended the maturity of the ReKT loan by 13 months, or 217% of the loan's original term. On December 30, 2022, Blue Ridge filed 6 UCC liens on ReKT assets. That the UCC liens were filed on December 30 suggests that the loan was extended either on December 30 or a day or two before—just in time to avoid having to report a $37.3 million default in Blue Ridge's 2022 10-K.

2.     *Blue Ridge extends the ReKT loan because ReKT can't repay it*

54.     Within two months of Blue Ridge's loan to ReKT, Summit made a demand to ReKT that far exceeded its available cash.

55.     In consideration for its 2020 loan to ReKT, Summit had received warrants that could be settled in cash if ReKT were acquired. The value of those warrants, at ReKT's $470 million valuation in the Infinite Reality acquisition, was $27 million. On July 28, 2022, Summit gave ReKT written notice that it intended to settle the warrants for $27 million in cash. ReKT declined, stating in an August 3, 2022, letter that it had no cash to settle the warrants. After some back-and-forth, Summit sued ReKT and Infinite Reality in mid-November 2022. *Summit Investors Credit III, LLC v. Infinite Reality, Inc.*, 654464/2022 (N.Y. Sup.).

56.     In its complaint, Summit included an allegation that ReKT had stated that neither it nor Infinite Reality had "sufficient funds legally available [] under applicable law" to make the payments. *Id.* ¶14. On January 12, 2023, ReKT filed its motion to dismiss, attaching the letter. The letter stated that "neither ReKTGlobal nor Infinite Reality and its subsidiaries has sufficient funds for the repurchase of ***any portion*** of the [$27 million] and neither has the financing to fund ***any portion*** or all of the [$27 million]." *Summit Investors Credit III, LLC v. Infinite Reality, Inc.*, 654464/2022, NYSCEF No. 25 (N.Y. Sup.) (emphasis added).

57.     Moreover, it is hardly surprising that ReKT has no cash. It operates in a notoriously unprofitable industry and though it has existed since 2016, in only earned $15 million of revenues in 2022, according to ReKT co-founder and chairman Amish Shah.

58.     There were other signs that ReKT was financially distressed. ReKT had retained a financial advisory firm, Cowen & Company, in connection with the Infinite Reality acquisition. ReKT did not pay Cowen's contractual fee of $3 million. In December 2022, Cowen agreed to settle for a $1 million payment—far short of the $3 million it was contractually entitled—*if* ReKT paid before year's end. If ReKT let the payment slip into Q1 2023, it would owe $1.5 million. It would owe $2 million if it made the payment in Q2 2023, $2.5 million if in Q3 2023, and $3.0 million if in Q4 2023. Yet ReKT did not pay the $1 million.[2] Its failure is telling: it effectively incurred a 200% annualized interest rate. ReKT would not have done so if it had $1 million to spare, let alone the $37.5 million it owed Blue Ridge. *Cowen & Company, LLC v. ReKTGlobal Holding, LLC*, NYSCEF No. 8, 0650756/2024 (N.Y. Sup.).

59.     When a lender extends a concession to a financially troubled borrower on terms it otherwise would not consider because the borrower is unable to pay back the loan pursuant to its terms, the lender must disclose the full loan amount as a troubled debt restructuring, commonly referred to as a TDR. The bank must disclose at least the total number of TDRs and the total dollar value of all its TDRs. ASC 310-40-15-5.

60.      One of the most common types of TDRs occurs when the creditor defers cash payments to help the debtor attempt to improve its financial condition and eventually pay off the creditor. ASC 310-40-15-6(a). If the restructuring results in a significant delay in payment, the loan must be accounted for as a TDR. ASC 310-40-15-17. In determining whether a delay is

---

[2] *Cowen & Co., LLC v. ReKTGlobal Holding, LLC*, 0650756/2024 NYSCEF  No. 5 (N.Y. Sup.)

significant, banks must consider: (1) the frequency of payments due under the debt, (2) the debt's original contractual maturity, and (3) the debt's original expected duration. *Id.* Here, Blue Ridge extended the maturity date by 217% of the original term and pushed off any payment of principal until that time. The restructuring resulted in a significant delay in payment by any of the above metrics.

61.    GAAP provides several indicators to help banks determine when a borrower is experiencing financial difficulties, including: (1) it is probable that the debtor would be in payment default on any of its debt in the foreseeable future without the modification, even though the debtor is not currently in payment default; (2) the debtor's entity-specific cash flows will be insufficient to service both the interest and principal in accordance with the existing contractual terms for the foreseeable future; or (3) without modification the debtor would not be able to obtain funds from other sources at the current market interest rate for a nontroubled debtor. ASC 310-40-15-20. Here, ReKT did not even have $1 million to pay its investment banker, let alone $37.3 million to pay Blue Ridge. ReKT was financially troubled by any of the above metrics.

62.    Blue Ridge's Original and Restated 2022 10-Ks set out its accounting policies for recognizing TDRs, which mirrored GAAP:

> Loans considered to be TDRs are loans that have their terms restructured (e.g., interest rates, loan maturity date, payment and amortization period, etc.) in circumstances that provide payment relief to a borrower experiencing financial difficulty.

63.    Thus, when Blue Ridge extended the ReKT loan by 217% in December 2023, there were facts, known to Defendants, that ReKT did not have any cash to repay the loan. Moreover, ReKT could not have obtained such terms in a market transaction. That ReKT had no money and no ability to raise financing to pay Summit back shows that a $37.5 million loan would only be available, if at all, on usurious terms, and not for more than a year. That Blue Ridge knew ReKT

was unable to repay the loan and that it extended the loans on non-market terms shows that it offered the extension *because* ReKT was unable to pay back the loan. Blue Ridge admitted as much when it restated its 2022 10-K to recognize the ReKT loan as a TDR.

64.     Accordingly, Blue Ridge understated the dollar value of its TDR in the Original 2022 10-K:

|     | As originally stated | As restated | Amount overstated or (understated), in dollars | Amount understated or overstated, in % |
| --- | --- | --- | --- | --- |
| TDR | $1.1 mln | $38.3 mln | ($37.3 mln) | 97% |

### D.    A $23.7 Million Loan Moser Issues to Failing Colleges Immediately Goes Bad

#### 1.    *Moser Issues a $23.7 Million Loan to Troubled Educational Institutions*

65.     South University – Member LLC and The Arts Institutes International, LLC are multi-campus, nominally not-for-profit, higher educational institutions. In January 2019, they were acquired by Colbeck, which used the Colbeck Foundation as the acquisition vehicle.

66.     After many scandals involving for-profit universities, market participants began to use nominally not-for-profit institutions, like the Colbeck Foundation, to shield questionable transactions from transparency. Like other market participants, Colbeck profits from Colbeck Foundation by extracting tens of millions of dollars from South University and The Arts Institutes per year for some unspecified services. These services were provided through a Master Services Agreement signed with a Colbeck Capital subsidiary, Studio Enterprise Manager, LLC

("Studio").[3] In their publicly-filed financial statements, each institution describes the services Studio provides as "non-core [] including marketing support, corporate technology, and other administrative services."[4]

67.    In 2019, South University paid Studio $14.5 million, and The Arts Institute paid $19.3 million for a total of $33.8 million.[5] In 2020, South University paid $20.1 million and The Arts Institutes paid $15.3 million, for a total of $35.4 million.[6] In 2021, as The Arts Institutes' fortunes faded, Studio charged The Arts Institutes $18 million, but only collected $3.8 million, and forgave the rest; South University paid $22.0 million, for a total of $25.8 million.[7] In 2022, Studio charged The Arts Institutes $18 million, but forgave the whole sum, while collecting $47.3 million from South University.[8] Thus, in 4 years, Colbeck Capital collected $142.3 million from the two cash-strapped institutions. And Colbeck Capital's decision to just shift the bill from The Arts Institutes to South University when the former proved unable to pay is evidence that the "services" it provided were illusory.

---

[3] Colbeck attempted to conceal from the public that it owned Studio, even attempting to file a notice of interested persons **under seal** when Studio's subsidiary brought a suit in federal court. *Studio Enterprise, LLC v. SSB Bancorp, Inc.*, 23-cv-2095-CB, Dkt. No. 5, 9 (W.D. Pa.)

[4] The Arts Institutes International, LLC and Subsidiaries, Consolidated Financial Statements as of December 31, 2022, at 22; South University – Member, LLC and Subsidiaries Consolidated Financial Statements as of December 31, 2022, at 22. All tax forms referenced in this Complaint are available from https://projects.propublica.org/nonprofits/

[5] The Arts Institutes 2019 Financial Statements, at 15; South University 2019 Financial Statements, at 20.

[6] The Arts Institutes 2020 Financial Statements, at 18; South University 2020 Financial Statements, at 22.

[7] The Arts Institutes 2021 Financial Statements, at 18; South University 2021 Financial Statements, at 19.

[8] The Arts Institutes 2022 Financial Statements, at 18; South University 2022 Financial Statements, at 22.

68.    At the time of Moser's hiring, Blue Ridge already had a limited relationship with South University. In December 2020, Blue Ridge issued a $50 million loan to South University. Blue Ridge's total exposure was small, however. The loan was supported by the Federal Reserve's Main Street Lending program, a COVID-19 relief measure that, *inter alia*, required Blue Ridge to keep a minimum of only 5% of the loan ($2.5 million).[9]

69.    After Blue Ridge extended the first loan, South University and The Arts Institutes' fortunes deteriorated. According to The Arts Institutes' publicly-filed 2022 financial statements, a 2022 Department of Education examination found that Colbeck Foundation was insufficiently capitalized. In May 2022, the Department required that South University, The Arts Institutes, and the Colbeck Foundation secure an Irrevocable Letter of Credit in the amount of $23.7 million naming the Department as beneficiary. The letter of credit would cover some of the Department's losses if it were forced to intervene.[10]

70.    The Department's request came at a bad time for the Colbeck Foundation. In June 2022, the Department of Education and private plaintiffs submitted a motion for preliminary approval of a class action settlement resolving claims that the Department had improperly denied students' applications for relief from their federal loans because they had been defrauded by the educational institutions they attended. *Sweet v. Cardona*, 19-cv-3674-WHA, Dkt. 246 (N.D. Cal. June 22, 2022). The settlement identified certain institutions whose fraudulent representations had been so pervasive that the Department granted their students an automatic discharge. Both South

---

[9]  South University 2022 Financial Statements, at 13.

[10]  The Arts Institutes 2022 Financial Statements, at 22; South University 2022 Financial Statements, at 22.

University and The Arts Institutes were on the list.[11] The settlement harmed the colleges' reputations by casting a spotlight on their misconduct, showed that they were on the Department's watchlist, and also opened South University and The Arts Institute to a recoupment action from the Department. Not coincidentally, The Arts Institutes shuttered in September 2023.

71.     Yet notwithstanding its dire situation, the Colbeck Foundation was able to post the letter of credit in August 2022.[12]

72.     Blue Ridge had already issued a significant loan to the Colbeck Foundation. Moreover, public documents show, and FE 1 reports, that Blue Ridge was the lender.

73.     On August 3, 2022, Blue Ridge filed a series of UCC liens against the colleges. Certain of the forms included a box requesting that the secured party indicate to whom notice should be sent. Blue Ridge wrote that notice should be provided to its Luray branch (where Moser worked) "Attention: Andy Moser". Moreover, according to FE 1, as of late 2021, Blue Ridge had an outstanding loan to an educational institution of between $20 and $40 million. According to FE 1, the educational institution was affiliated with a New York hedge fund. FE 1's account matches the documents. Accordingly, FE 1's report shows that the educational institution is Colbeck Foundation, the hedge fund is Colbeck Capital, and Blue Ridge is the lender.

        2.     *Blue Ridge Attempts to Sell the Colbeck Loan at a Loss; an Internal Investigation Uncovers that Moser Engaged In Misconduct In Connection With the Colbeck Loan*

74.     Towards the end of Q4, 2022, FE 1 was tasked with assisting in an internal investigation of the South University loan and Blue Ridge's and Moser's relationships with

---

[11] South University's 4-year graduation rate is 7%. The 6-year graduation rate for its Savannah campus, one of its more successful, is 19%.

[12] Arts Institutes 2022 Financial Statements, at 22. South University 2022 Financial Statements, at 22.

Colbeck Capital. FE 1's boss's boss Doug Riddle, who headed the investigation, told FE 1 that the internal investigation had been ordered by Blue Ridge's Board of Directors. Riddle brought FE 1 into the investigation as "the most technical person" available. FE 1 would provide any findings to Riddle, who would then present them to the Board. In the briefing, Riddle told FE 1 that the Blue Ridge Board had found out about the Colbeck Loan and Blue Ridge's dealings with Colbeck Capital. The board was "furious" and "wanted [Moser] and [Plum] out."

75.     FE 1 learned through their investigation that the loan to South University was not performing well. Indeed, FE 1 quickly discovered that Moser was already trying to find a way that Blue Ridge could get out of the loan, even at a substantial loss. Moser offered to Colbeck Capital that one of its affiliates—one with no assets except an option to buy South University for $1—buy or take Blue Ridge out of the loan at a significant loss to Blue Ridge. In return, Blue Ridge would issue a loan to the Colbeck Capital affiliate to cover the letter of credit

76.     According to FE 1, the loan to the Colbeck Capital entity made no sense because not only did the Colbeck Capital entity have no assets, South University was prohibited by the Department of Education from distributing funds to its equity holders.

77.     Department of Education records corroborate FE 1's account. The Department of Education has created a program called Heightened Cash Management, a designation it imposes on schools for, among other things, financial irresponsibility. South University was perennially on the program. It has been designated as such every quarter from at least December 2020 through December 2023, the last available designation. Among other things, the designation mandated that Blue Ridge notify the Department within 10 days of all equity disbursements. The designation also restricted Blue Ridge's ability to access federal government loan and grant proceeds. Thus, South University's Heightened Cash Management designation corroborates FE 1's account.

Moreover, South University still had to make crippling monthly payments to Colbeck Capital under the Master Services Agreement.

78.    FE 1 also learned that Blue Ridge had made yet another loan to a Colbeck entity during Moser's tenure. According to FE 1, the loan had not been properly underwritten (i.e., adequate inquiries concerning the borrower's ability to pay had not been conducted). Instead, Moser had paid a personal friend $30,000 to write a 7-page memo justifying the loan. The loan was immediately funded, but to a third party, not the distributee set out in the contract. Plum had approved this other Colbeck loan, though he did not have the authority to do so.

79.    When Moser discovered that FE 1 was discovering misconduct, he threatened them. Moser called FE 1 on a Sunday in February 2023. Calling FE 1 on a Sunday ensured that FE 1 would not be in the office or, if they were, that the office would be empty. On the call, Moser explained that he had learned from Riddle that FE 1 was auditing the relationship between Blue Ridge and Colbeck Capital. Then, Moser stated: "[I] do not want any written records of your findings, no emails, no memos." Instead, Moser continued, if FE 1 found anything incriminating, they should "give me [Moser] a call" about it.

80.    FE 1 promptly told Riddle about Moser's call. Riddle later told FE 1 that he had discussed Moser's call to FE 1 with Defendant Plum. Riddle told FE 1 about Plum's response, that it was "a strange thing to say." Plum did not make any inquiries of FE 1 or reassure FE 1 that Moser had been acting improperly.

81.    FE 1 left Blue Ridge a month after Moser's Sunday call.

### E.    Blue Ridge Understated Both Its Nonaccrual and Impaired Loans

82.    Blue Ridge understated the value of its nonaccrual loans. According to the OCC Comptroller's Handbook (the OCC is Blue Ridge's regulator), "nonaccrual" is an accounting and regulatory term designating loans which are accounted for on a cash basis because of specific

23

problems "such that the full collection of interest and principal is ***highly questionable***." Loans must be categorized as nonaccrual if, among other causes, "payment in full of principal or interest is not expected." *Id*.

83.     Under GAAP, banks must disclose the total amount of nonaccrual loans in their financial statements.

84.     Blue Ridge's 10-K similarly provides:

> Loans are placed in nonaccrual status when in the opinion of management the collection of additional interest is unlikely or a specific loan meets the criteria for nonaccrual status established by regulatory authorities, generally 90 days or more past due.

85.     Under GAAP, all TDRs are also classified as nonaccrual. Thus, the ReKT loan was also nonaccrual.

86.     Indeed, in its Restated 2022 10-K, Blue Ridge admitted that it had originally placed the ReKT loan on nonaccrual status before filing the Original 2022 10-K.

> Included in the $38.3 million of TDRs as of December 31, 2022 was one $37.3 million specialty finance loan [the ReKT loan] (classified as commercial and industrial) ***that was modified via an extension of terms and placed on nonaccrual status in the fourth quarter of 2022.***

87.     Nor did Blue Ridge disclose the Colbeck Loan as nonaccrual.

88.     Moser's frantic attempts to sell the Colbeck Loan off at a loss showed that management subjectively believed that Blue Ridge probably would not be able to recover the balance of the South University loan. Blue Ridge did not have any pressing liquidity needs. It continued to pay its customary $0.1225 quarterly dividend in Q1 2023 and Q2 2023 and stated that it had ample liquidity. So if management believed it could recover the full amount of the principal and interest, it would not have tried to get rid of the Colbeck Loan for less than its full value. Thus, Blue Ridge was required to disclose that the Colbeck Loan was nonaccrual.

| | As originally stated | As restated | Amount overstated or (understated), in dollars | Amount understated or overstated, in % |
|---|---|---|---|---|
| Nonaccrual | $10.3 mln | $76.0 mln | ($65.7 mln) | 86% |

89.     GAAP also mandates disclosure of the amount of impaired loans.

90.     GAAP in effect at the time of the Original 2022 10-K provided that a loan is impaired if it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. ASC 310-10-35-16. But banks may also record loans as impaired if the loan's risk category is "substandard", which covers loans in which "there is a distinct *possibility* that the bank will sustain some loss." OCC Comptroller's Handbook, Rating Credit Risk, at 17.

91.     In the Original 2022 10-K, Blue Ridge recorded $37.9 million of specifically impaired loans. Of this, $37.3 million was the ReKT loan. But Blue Ridge did not disclose that the loan was nonaccrual such that the loss was probable. Instead, Blue Ridge represented that the loan was impaired because it was substandard, meaning that a loss was only possible. Blue Ridge's classification of the loan was materially misleading because it understated the risk of a loss.

92.     Moreover, Blue Ridge did not even record the Colbeck Loan as impaired. The remaining balance of impaired loans, after removing the ReKT loan, was a mere $0.4 million. In the Restated 10-K, Blue Ridge recorded $66.4 million of impaired loans, $28.4 million more than in the Original 2022 10-K, even after recording another $7.8 million more of bad debt. The new impaired loans consisted primarily of the entire amount of the Colbeck Loan plus an additional $12.5 million in other impaired loans.

93.     Because management subjectively believed that Blue Ridge would not recover interest and principal on the Colbeck Loan, Blue Ridge was required to account for it as non-performing.

94.     Accordingly, Blue Ridge understated the amount of impaired loans in the Original 10-K:

|  | As originally stated | As restated | Amount overstated or (understated), in dollars | Amount understated or overstated, in % |
|---|---|---|---|---|
| Impaired | $45.2 mln | $73.7 mln | ($28.5 mln) | 39% |

**F.    Blue Ridge Understated Its Allowance for Loan Losses and Overstated Its Net Income Because It Did Not Record A Provision For the Colbeck Loan**

95.     GAAP mandates that issuers estimate the amount of uncollectible debt and record the total uncollectible debt from all their loans as an Allowance for Loan and Lease Losses. Having no lease losses, Blue Ridge reported the metric as an Allowance for Loan Losses ("ALL"). ALL is recorded on the balance sheet as a reduction in the value of the issuer's assets. It is also recorded as a charge on net income. If the allowance results from subsequent events, it is recorded as a charge on net income when first recorded. But "[i]f a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the date of loan origination." ASC 942-310-25-1.

96.     Issuers calculate ALL by, among other things, examining impaired loans. The amount of impairment recorded on each loan is based on the present value of expected future cash flows, discounted at the loan's effective interest rate or, if the bank expects to recoup its loan by foreclosing on the collateral, at the fair value of the collateral. ASC 310-10-35-22. While smaller dollar value loans are collectively evaluated for impairment, larger loans like the Colbeck Loan are examined individually.

26

97.     Similarly, Blue Ridge explained in the Original 2022 10-K that:

> The allowance for loan losses consists of specific and general components. The specific component relates to loans that are determined to be impaired and, therefore, individually evaluated for impairment. … Measurement of impairment is based on the expected future cash flows of an impaired loan, discounted at the loan's effective interest rate, or measured based on an observable market value, if one exists, or the fair value of the collateral underlying the loan, discounted to consider estimated costs to sell the collateral for collateral-dependent loans. If the net value is less than the loan balance (including any unamortized premium or discount associated with the loan) an impairment is recognized and a specific reserve is established for the impaired loan.

98.     Blue Ridge did not record the Colbeck Loan as impaired and did not record any impairment for the loans. As a result, Blue Ridge materially understated its allowance for loan losses. Blue Ridge conceded as much in the Restated 2022 10-K, which increased ALL by $7.8 million, or 25%, to account for the Colbeck Loan and other Moser loans.

99.     In addition, an allowance for loan losses is recorded as a charge against net income. Both the ReKT and Colbeck Loans were issued and impaired in 2022. Thus, Blue Ridge's net income was overstated in the Original 2022 10-K, as Blue Ridge admitted in the Restated 2022 10-K.

|  | As originally stated | As restated | Amount overstated or (understated), in dollars | Amount understated or overstated, in % |
|---|---|---|---|---|
| Allowance for Loan Losses | $22.9 mln | $30.7 mln | ($7.8 mln) | 39% |
| Net income (FY 2022) | $27.6 mln | $17.0 mln | $10.6 mln | 62% |
| Net income (Q4 2022) | $6.3 mln | ($4.3 mln) | $10.6 mln | 247% |

### G.     Defendants' False Statements Were Quantitatively and Qualitatively Material

100.    GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements. The SEC has the statutory authority to set accounting standards and has delegated that authority to the Financial Standards Accounting Board ("FASB").

101.    The FASB accounting standards codification ("ASC") and the SEC rules and interpretive releases are source of authoritative GAAP for SEC registrants. SEC Staff also issues Staff Accounting Bulletins ("SABs") which represent practices followed by the SEC staff in administering SEC disclosure requirements. ASC 105-10-05-1.

102.    SEC and NYSE Amex rules and regulations require that publicly traded companies such as Blue Ridge include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. Section 13 of the Exchange Act, 15 U.S.C. § 78m; SEC Rule 10-01(d) of Regulation S-X ("Reg. S-X"), 17 C.F.R. § 210.10-01(d).

103.     SEC Rule 4-01(a) of Reg. S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

104.    According to the FASB Statement of Financial Accounting Concepts No. 8, "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." According to SAB 99, evaluating materiality requires viewing the facts in the context of surrounding circumstances or as a "total mix." This means considering not only the quantitative but also qualitative factors. SAB 99 recognizes that a 5% threshold in relation to

individual line item amounts, subtotals or totals in the financial statements is often used as a "rule of thumb" in assessing materiality but cautions that such evaluation should be only the beginning of a materiality assessment and "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." Therefore, misstatements of financial statements which are less than 5% "could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material." *Id*. According to the SEC staff, qualitative considerations include "whether the misstatement masks a change in earnings or other trends, … [and] whether the misstatement changes a loss into income or vice versa." *Id*.

105.    In the Original 2022 10-K, Defendants overstated or understated each of TDRs, nonaccrual loans, impaired loans, allowance for loan losses, and 2022 net income by more than 5%. In the press release disclosing Q4 2022 financial results, Defendants also overstated Q4 2022 net income by more than 5%.

106.    High amounts of TDRs, impaired loans, and nonaccrual loans are red flags to investors. As Blue Ridge admitted in the Original 2022 10-K, when describing the initial, understated figures:

> The Company's nonperforming assets adversely affect its net income in various ways. Nonperforming assets, which include nonaccrual loans and loans past due 90 days and still accruing interest (excluding purchased credit-impaired loans and accruing TDRs) and other real estate owned ("OREO"), were $18.6 million, or 0.59% of total assets, as of December 31, 2022. When the Company receives collateral through foreclosures and similar proceedings, it is required to record the related loan to the then fair market value of the collateral less estimated selling costs, which may result in a loss. An increased level of nonperforming assets also increases the Company's risk profile and may impact the capital levels regulators believe are appropriate in light of such risks. The Company utilizes various techniques such as workouts, restructurings, and loan sales to manage problem assets. Increases in, or negative changes in, the value of these problem assets, the underlying collateral, or in the borrowers' performance or financial condition, could adversely affect the Company's business, results of operations, and financial condition. In addition, the resolution of

> nonperforming assets requires significant commitments of time from management and staff, which can be detrimental to the performance of their other responsibilities, including generation of new loans. There can be no assurance that the Company will avoid increases in nonperforming loans in the future.

107. Further, the misstatement concealed that Blue Ridge was suffering dramatic losses in its fastest-growing line of business, commercial and industrial loans. These losses were unsustainable, and Blue Ridge had already decided to exit the specialty financial business, though without disclosing as much to investors. Finally, by understating ALL, Blue Ridge managed to turn a $4.3 million loss in Q4 2022 into a $6.3 million gain, thus changing a loss into a gain.

108. Thus, Blue Ridge's overstatements were both quantitively and qualitatively material.

## VI.   DEFENDANTS' SPECIFIC ACTIONABLE STATEMENTS AND OMISSIONS

109. On February 2, 2023, after close of trading, Blue Ridge published a press release announcing Q4 2022 results ("Q4 2022 Press Release"). In the Q4 2022 Press Release, Blue Ridge reported that as of December 31, 2023, "[n]onperforming loans (including nonaccrual loans) totaled $18.6 million, or 0.59% of total assets."

110. On March 10, 2023 Blue Ridge filed the Original 2022 10-K. Defendants Plum and Gavant each signed the 10-K and each also executed a Sarbanes-Oxley certification attesting to its accuracy. In the Original 2022 10-K, Defendants likewise reported that the value of nonperforming loans totaled $18.6 million, of which nonaccrual loans made up $10.3 million.

111. Defendants' statements quoted in the foregoing paragraphs were false. As Blue Ridge admitted in the Restated 2022 10-K, as of December 31, 2022, the total value of its nonaccrual loans was $76.1 million, or $65.9 million more than the $10.3 million Blue Ridge reported. Because nonperforming loans include all nonaccrual loans, the total value of Blue

Ridge's nonperforming loans was $84.3 million. See ¶¶82-94. The initially reported $18.6 million value for nonperforming loans excluded both the $37.3 million ReKT loan and the $23.7 million Colbeck Loan, but the exclusion was improper. Specifically, Blue Ridge had extended the entire $37.3 million ReKT loan by thirteen months, a concession that it would not have considered but for ReKT's financial status. Thus, Blue Ridge was required to disclose the ReKT loan as a TDR and thus, by definition, as a nonaccrual loan. ¶¶82-87. And because management had subjectively determined that it would not recover the full principal and interest from the $23.7 million Colbeck Loan, it should also have been recorded as nonaccrual. In addition, Moser issued a few smaller loans, amounting to $12.5 million, that Blue Ridge had determined were nonaccrual as of December 31, 2022, but did not disclose as such. See ¶¶74-77; 92-94

112.    In the Original 2022 10-K, Defendants stated that "[t]he company had 11 TDRs in the amount of $1.1 million as of December 31, 2022."

113.    Defendants' statements was false because it excluded the $37.3 million ReKT loan, which was a TDR. ¶111. In addition to the 11 TDRs Blue Ridge disclosed, Blue Ridge had extended concessions to ReKT on the $37.3 million ReKT loan that it would not have considered but for ReKT's financial status. So Blue Ridge was required to disclose the ReKT loan as a TDR. Thus, as Blue Ridge conceded in the Restated 2022 10-K, Blue Ridge had 12 TDRs in the amount of $38.3 million.

114.    In the Q4 2022 press release, Defendants reported that "[a]llowance for loan losses increased by $4.0 million in Q4 2022, or 0.95% of gross loans held for investment." In the Original 2022 10-K, Blue Ridge reported that its ALL was $22.9 million

115.    Defendants' statements in the foregoing paragraph were false. Because Blue Ridge's management had subjectively determined that the Colbeck Loan was impaired, Blue

31

Ridge was required to evaluate the loan for impairment. But Blue Ridge neither disclosed the Colbeck Loan as impaired nor recorded an impairment. Blue Ridge neither disclosed as impaired nor recorded an impairment for an additional $12.5 million in nonaccrual loans issued by Moser. ¶95-99; 111. Defendants violated GAAP by failing to recognize an impairment for the Colbeck Loan, materially understating its allowance for loan losses. As set out in the Restated 2022 10-K, the true ALL was $30.7 million, not $22.9 million, and ALL as a proportion of total gross loans was 1.27%.

116.    In both the Q4 2022 Press Release and the 2022 10-K, Defendants reported FY 2022 net income of $27.6 million. In the Q4 2022 Press Release, Defendants also reported Q4 2022 net income of $6.3 million. Investors could also deduce the amount of Q4 2022 net income by subtracting net income for the first 9 months of 2022 set out in Blue Ridge's Q3 2022 10-Q from the amount of net income in the 2022 10-K.

117.    These statements were false. As alleged in ¶115, above, Blue Ridge was required to, but did not, record an impairment on the Colbeck Loan and several other loans issued by Moser. Blue Ridge's true net income (loss) for the FY and quarter ended December 31, 2022 were $17.0 million and ($4.3 million), respectively.

118.    In sum, Defendants overstated the following Blue Ridge financial metrics disclosed in the Q4 2022 Press Release and Original 2022 10-K as follows:

| | As originally stated | As restated | Amount overstated or (understated), in dollars | Amount understated or overstated, in % |
|---|---|---|---|---|
| TDR | $1.1 mln | $38.3 mln | ($37.3 mln) | 97% |
| Nonaccrual | $10.3 mln | $76.0 mln | ($65.7 mln) | 86% |
| Impaired | $45.2 mln | $73.7 mln | ($28.5 mln) | 39% |

| Allowance for Loan Losses | $22.9 mln | $30.7 mln | ($7.8 mln) | 39% |
| Net income (FY 2022) | $27.6 mln | $17.0 mln | $10.6 mln | 62% |
| Net income (Q4 2022) | $6.3 mln | ($4.3 mln) | $10.6 mln | 247% |

## VII.    LOSS CAUSATION

119.    On April 27, 2023, after close of trading, Blue Ridge published a press release announcing its Q1 2023 results.

120.    In the Q1 2023 press release, Blue Ridge reported that nonperforming loans had increased from $18.6 million as of the end of 2022 to $30.7 million as of the end of Q1 2023, primarily because of two commercial loans which Blue Ridge had belatedly recognized as nonaccrual in Q1 2023. These loans should have been recognized as nonaccrual in Q4 2022.

121.    Defendants' failure to recognize these loans as nonperforming in Q4 2022 artificially inflated Blue Ridge's stock price. Blue Ridge's recognition of some of the nonperforming loans partially dissipated some of the artificial inflation of its stock price. On April 28, the price of Blue Ridge stock fell from its previous close of $9.94 to close at $9.67, down 2.8% ($0.27), on unusually heavy trading volume, damaging investors, even as the stock prices in the market generally and of companies similar to Blue Ridge increased. On May 1, the next trading day, Blue Ridge's stock price fell again to $8.94, down $0.73 (7.9%), as investors continued to incorporate the news.

122.    On July 31, 2023, during trading hours, Blue Ridge published a press release to announce its Q2 2023 results. In the press release, Blue Ridge reported that as of June 30, 2023, it had categorized $86.1 million in loans as non-performing. Blue Ridge also announced that it had recorded a provision for credit losses of $20.5 million during the quarter, net of an $8.0

million charge-off. The press release attributed the increase in the provision for credit losses primarily to "a group of loans, totaling $58.1 million at quarter-end, [] sourced by a former lender, and [] best described as specialty finance that we deemed to be not in keeping with our desired risk profile."[13] In addition, Blue Ridge announced that specific reserves for the specialty finance loans totaled $14.1 million. The "former lender" was Moser, the specialty finance loans were Moser's loans, and the $58.1 million increase included the ReKT loan and the Colbeck Loan, net of the significant allowance for loan losses and write-offs that Blue Ridge had since then recorded for those loans.

123.    Defendants' failure to disclose these loans as nonaccrual in Q4 2022 artificially inflated Blue Ridge's stock price. Blue Ridge's recognition of the loans as nonaccrual partially dissipated the artificial inflation of its stock price. On July 31, 2023, Blue Ridge's stock price fell from its previous close of $9.23 to close at $8.42, down $0.80 (9.1%). On August 1, 2023, as investors continued to absorb the news, Blue Ridge's stock price fell again to $7.98, down another $0.44 (5.5%).

124.    Finally, on October 31, 2023 Blue Ridge filed a Form 8-K advising investors not to rely on the 2022 10-K, the Q1 2023 10-Q, or the Q2 2023 10-Q:

> [T]he Company's audited financial statements included in the Company's annual report on Form 10-K for the year ended December 31, 2022, and unaudited interim financial statements included in quarterly reports on Form 10-Q for the quarters ended March 31, 2023 and June 30, 2023 should no longer be relied upon and will be restated.

---

[13] A portion of the increase resulted from a change in accounting standards which retired ALL in favor of the new provision for credit losses, which imposed a slightly different methodology for estimating and writing off bad debt.

125.    Therein, Blue Ridge disclosed that the TDRs, nonaccrual loans, increases in ALL, and decreases in net income recognized in Q1 and Q2 2023 should have been recognized in Q4 2022:

> On October 30, 2023, management of Blue Ridge Bankshares, Inc. (the "Company") and the Audit Committee of its Board of Directors, after consultation with the Company's independent registered public accounting firm and its primary regulator, ***determined that certain specialty finance loans that, as previously disclosed, were placed on nonaccrual, reserved for, or charged off in the interim periods ended March 31, 2023 and June 30, 2023 should have been reported as nonaccrual, reserved for, or charged off in earlier periods.***

126.    On this news, the price of Blue Ridge stock fell from its previous close of $3.15 to close at $2.09, down $1.06 (33.7%), damaging investors.

## VIII.    ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

### A.    Moser Engaged In Deliberate Misconduct

127.    Blue Ridge's failure to properly account for the state of its loans is the direct result of Moser's misconduct.

128.    Moser's misconduct includes, but is not limited to, his call to FE 1 on a Sunday in February 2023, when FE 1 was unlikely to be in the office, to demand that they leave no "written records of [their] findings, no emails, no memos" of their investigation. Moser also insisted that FE 1 call Moser directly if they discovered any irregularities.

129.    Moser's attempt to obstruct an internal investigation was deliberate misconduct. Moreover, that Moser insisted that FE 1 first inform him of any irregularities suggests that Moser was aware of irregularities.

130.    Thus, Moser's interference with the internal investigation, and the internal investigation's findings, support the inference that Defendants made statements in the 2022 10-K with scienter.

35

131.    Moser's pre-Class Period misconduct, stealing from his employer and forging documents to cover it up, also supports an inference of scienter, especially because he once again stole from his employer by paying a personal friend $30,000 to draft a 7-page memo for a loan he issued.

### B.    Blue Ridge Fires Plum and Moser

132.    Plum and Moser were abruptly terminated after the internal investigation in which FE 1 assisted.

133.    On December 21, 2022, Blue Ridge announced that it had entered into an employment agreement with Defendant Plum ("Renewed Contract"). The Renewed Contract entitled Defendant Plum to a 3-year term, expiring on December 21, 2025. Despite signing the new contract, Plum did not stay for the entirety of his term. On May 8, 2023, Plum resigned as CEO of Blue Ridge Bank. Soon after that, on July 12, 2023, Plum resigned as President and CEO of Blue Ridge, effective immediately.  There had been no previous indications that Plum was unhappy with his job; Plum was fired.

134.    Similarly, FE 3 reports that Moser was fired in or around March 2023.

135.    The two terminations support the inference that Defendants made false statements in the 2022 10-K with scienter.

### C.    Commercial and Industrial Loans Were Blue Ridge's Fastest-Growing Category of Loans Part of Blue Ridge's Portfolio; Issuing the ReKT and Colbeck Loans Violated Blue Ridge's Stated Policy.

136.    Between December 31, 2020, and December 31, 2022, commercial and industrial loans had grown from $93.3 million (9.4%) of Blue Ridge's portfolio to $590 million (24.4%).

137.    Defendants acknowledged that without additional precautions, commercial and industrial loans would present higher risk. Thus, as reassurance, Defendants claimed in the

Original 2022 10-K that the loans therefore "are underwritten with strict risk management standards."

138.    As set out in the Original 2022 10-K, the criteria for these strict management standards included "cash flow analysis of the business and business collateral."

139.    The ReKT and Colbeck Loans were large loans to financially troubled companies.

140.    Neither the ReKT nor Colbeck Loans were underwritten according to anything like strict risk management standards. Neither Infinite Reality nor ReKT had significant cash flows to speak of. Moreover, Colbeck systematically stripped the Colbeck Foundation of its cash through vague contracts for unspecified services.

141.    Defendants had an incentive to conceal that the ReKT and Colbeck Loans were nonaccrual because accurately disclosing their status would show that Blue Ridge had departed from its stated policy for underwriting commercial and industrial loans.

## D.    Defendants Regularly Boasted of Blue Ridge's Ratio of Nonperforming Assets to Total Assets

142.    In their attempt to market Blue Ridge to investors, Defendants typically stressed Blue Ridge's purportedly low ratios of bad loans to total loans as evidence of its conservative and sound underwriting practices.

143.    Beginning in September 2019, Blue Ridge's Investor Presentations all included a slide boasting of its "Asset Quality and Credit Culture", or words to that effect. The slide featured the low ratio of nonperforming assets to and allowance for loan losses to total loans.

144.    The failure of the ReKT and Colbeck loans was a dramatic departure from these historical ratios. In its Q3 2022 10-Q, Blue Ridge reported that the ratio of nonperforming loans to total loans was 0.36%. In the Original 2022 10-K, it reported a ratio of 0.59%. Had it correctly

recorded the Colbeck and ReKT loans as nonaccrual, Blue Ridge would have reported an alarming ratio of 2.69%, undercutting any claim that Blue Ridge had a conservative lending culture.

145.    Defendants had an incentive to conceal the Colbeck and ReKT loans from investors because disclosing their true status would preclude Blue Ridge from boasting of having quality assets and a quality credit culture, its historical pitch to investors.

### E.    Defendants Were Personally Involved in the ReKT and Colbeck Loans

146.    Defendants Plum and Moser were involved in issuing and monitoring the ReKT and Colbeck Loans.

147.    Moser originated the ReKT loan, Plum approved it, and it was discussed in consecutive sessions of a committee on which both Plum and Gavant sat. Similarly, Plum was aware that Blue Ridge was conducting an internal investigation into the Colbeck Loan and Blue Ridge's relationship with the Colbeck entities. Not only did the instruction come directly from the Board of Directors, Plum was told that Moser had told FE 1 not to create any written records of the investigation.

148.    Moser also led the efforts to sell off the Colbeck Loan at a loss.

149.    Defendants' personal involvement in the ReKT and Colbeck Loans support an inference that they knew the loans were not correctly recorded on Blue Ridge's financial statements.

### F.    The Timing of the Extension of the ReKT Loan Supports Scienter

150.    Blue Ridge recorded six UCC liens against ReKT on December 30, 2022, the first since Blue Ridge initially recorded liens in June 2022 when it issued the ReKT loan.

151.    That Blue Ridge recorded the liens on December 30, 2022, means that it extended the loan on December 30, or at most a day or two before.

152.    Had Blue Ridge not extended the loan, it would have had to record the ReKT loan as having defaulted in its financial statements for the year ended December 31, 2022.

153.    Defendants' perfectly-timed "rolling" of the ReKT loan ensured that Blue Ridge did not have to record a huge loss in the Original 2022 10-K.

**G.    Plum and Gavant Were Experienced Accounting Professionals**

154.    Both Plum and Gavant are CPAs.

155.    Both Plum and Gavant have significant experience working as CPAs in accounting firms.

156.    Both Plum and Gavant have significant experience as senior bank executives responsible for accounting. Plum served as Blue Ridge's CFO for 8 years. Gavant served as a Chief Accounting Officer for 8 years and, as of December 2022, had served as a bank CFO for four and a half years, the last two of them at Blue Ridge.

157.    Plum and Gavant's experience with bank accounting support an inference that they knew or were reckless in not knowing that Blue Ridge was not properly disclosing the status of the ReKT loan, the Colbeck Loan, and Moser's other loans, on the Original 2022 10-K.

158.    Moreover, failing to recognize the ReKT loan, the Colbeck Loan, and the other loans as TDRs, nonaccrual, and impaired, as well as failing to take an allowance for loan losses, as set out herein, violated not just GAAP but also Blue Ridge's own policies, which further supports an inference of scienter.

**H.    Recognizing the ReKT and Colbeck Loans as Nonaccrual Would Have Brought Blue Ridge Close to Breaching Regulatory Capital Requirements**

159.    Banks fund themselves both through equity capital and debt. Banks can magnify both their profits and their losses by increasing the debt portion of their funding. If a bank borrows $0.99 to buy an asset worth $1, then if the asset increases in value to $1.01 (a 1% increase) the

bank will then own $0.02 net of debt, double what it invested. Conversely, if the asset falls to $0.99, then the bank will own an asset worth $0.99 and owe $0.99, wiping out the bank's investment.

160.    To prevent banks from taking on too much leverage, regulators have enacted capital ratios that require banks to maintain a certain proportion of the bank's funding from equity rather than debt. These requirements would prohibit the bank from borrowing 99% of its capital, for example. Rather, the bank could only borrow some smaller proportion of the value of its assets and would have to put up the rest as equity capital. Failure to maintain adequate risk-weighted regulatory capital can bring severe consequences to shareholders. Among other things, banks may be required to sell additional shares at a discount in a hurry to meet requirements.

161.    Among these capital requirements is the ratio of risk-based capital to total assets. The risk-based capital ratio assigns weights to different kinds of assets. More regulatory capital is required for riskier assets. In the risk capital ratio, assets such as treasuries are considered risk free and do not require regulatory capital. Loans that are current on payments require regulatory capital, but much less than nonaccrual loans, which are considered riskier and demand much higher levels of regulatory capital. Allowances for loan losses reduce the amount of assets firms have to meet regulatory capital requirements. Thus, the risk-based capital ratio may fall if a bank takes an allowance for loan losses or recharacterizes a loan as nonaccrual or impaired.

162.    Blue Ridge must maintain a ratio of risk-weighted regulatory capital to total assets and buffer of 10.5% or more. By misstating the status of its loans in the Original 2022 10-K, Blue Ridge kept its reported capital ratio at 11.13% as of the end of 2022. In truth, as Blue Ridge stated in the Restated 2022 10-K, the ratio was 10.93%, and further decreases were anticipated. The ratio dipped to 10.72% as of March 31, 2023, and 10.60% as of June 30, 2023.

163.    Blue Ridge's risk capital breached the 10.50% minimum as of September 30, 2023. The consequences were swift and severe. Because of the breach and other failings, on January 24, 2024, Blue Ridge entered into a consent order with the OCC, its regulator. One of the Consent Order's provisions required that Blue Ridge increase its risk-weighted regulatory capital ratio to 13.00%. To meet the requirement, Blue Ridge had to immediately raise $150 million by selling stock at deeply discounted values. In total, Blue Ridge sold the equivalent of 86 million shares, though it previously had only 22 million shares outstanding, leaving existing shareholders holding only about 20.4% of the company.

164.    The specialty finance loans was one of the reasons, if not the principal reason, for the OCC's decision to raise Blue Ridge's minimum risk-weighted regulatory capital ratio to 13.00%. According to Blue Ridge's 2023 10-K, Blue Ridge consulted the OCC before restating its financial statements to redesignate the specialty finance loans as nonaccrual.

## I.    The ReKT and Colbeck Loans Were Large and Atypical

165.    Blue Ridge is a small regional community bank that makes local loans. Its expertise reflects its focus on community loans. For example, Blue Ridge's commercial lenders worked out of branch offices and issued and approved loans in their own community.

166.    Blue Ridge was not equipped to adequately underwrite the specialty finance loans Moser issued. As to the ReKT loan, Blue Ridge's Risk Committee ordered a special third-party investigation, effectively recognizing it did not have the talent to evaluate the loan in house. The third-party expert then told Blue Ridge's Risk Committee as much when it reported that "you guys are in something it's not your business being in."

167.    Moreover, the ReKT and Colbeck Loans were large by any metric. They constituted 2.0% of Blue Ridge's total portfolio. They amounted to 221% of Blue Ridge's 2022 net income. And they were equal to 23% of Blue Ridge's total regulatory capital as of December

31, 2022. Thus, losses in the loans had the potential to wipe out a year's worth of income or push Blue Ridge below regulatory capital ratios.

168.    Even before the Class Period, Blue Ridge gave significant attention to both the ReKT and Colbeck Loans. Blue Ridge's Risk Committee and Board commissioned an outside study of the ReKT loan and commenced an internal investigation of both the Colbeck Loan and Blue Ridge's relationship with Colbeck Capital and its affiliates. The ReKT loan was discussed at successive Risk Committee meetings.

169.    ReKT was Blue Ridge's biggest TDR by far. In the Original 10-K, Blue Ridge claimed that it had 11 TDRs, but that the loans only added up to $1.1 million in total. The ReKT loan alone was more than thirty times larger than the total amount of all of Blue Ridge's other TDRs

170.    The ReKT loan was also massive compared to Blue Ridge's historical performance. Blue Ridge's disclosed TDRs totaling $688,000 as of December 31, 2021, $142,000 as of December 31, 2020, and $144,000 as of December 31, 2019.

171.    Because of the ReKT loan's size and the dramatic increase it would mark from Blue Ridge's historical performance, Defendants had an incentive to conceal from investors that it was a TDR.

## IX.    DEFENDANTS' SCIENTER IS IMPUTED TO BLUE RIDGE

172.    Blue Ridge is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

173.    The scienter of the Individual Defendants and other employees and agents of Blue Ridge is similarly imputed to the Company under *respondeat superior* and agency principles.

Plum and Gavant, both CPAs who sat on Blue Ridge's Risk Committee, were Blue Ridge's two most senior officers, and both signed the Original 10-K.

174.    When the 2022 Press Release and Original 2022 10-K were issued, Moser was Executive Vice President and Chief Lending Officer for Blue Ridge Bank. Because of his senior position, Moser's scienter is imputed to Blue Ridge.

175.    Moreover, while not required to impute his scienter, Moser furnished information that was reported in Blue Ridge's Original 2022 10-K. Moser was involved in the subject of Defendants' false statements. He was the Blue Ridge executive most familiar with the ReKT and Colbeck Loans because he personally issued both. Whether the ReKT loan was a TDR depended on Blue Ridge's reasons for extending the loan. Moser personally renegotiated the ReKT loan. He is likely the source of the information that the ReKT loan was not extended because ReKT couldn't pay it back. Because Moser was a Blue Ridge's Chief Lending Officer and was the person most familiar with the loans, he would have been consulted in determining whether either the ReKT or Colbeck Loans should be recorded as a TDR, nonaccrual or impaired, and whether and how much of an ALL Blue Ridge should record for either loan.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

176.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Blue Ridge common stock publicly traded on the NYSE Amex during the Class Period, and held the stock through at least one of the corrective disclosures identified in ¶¶119-126 herein ("Class"). Excluded from the Class are Defendants, the officers and directors of Blue Ridge, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

177.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Blue Ridge common stock were actively traded on the NYSE Amex. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members of the proposed Class.

178.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

179.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

180.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Blue Ridge;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

44

- whether the Defendants caused Blue Ridge to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Blue Ridge common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

181.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE

182.    In addition, common issues of fact and law predominate over individual issues. In particular, to avoid individual proof of reliance, Plaintiff invokes, in part, the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Blue Ridge common stock met the requirements for listing, and was listed and actively traded on the NYSE Amex, a highly efficient and automated market;

- Blue Ridge's securities were liquid and traded with moderate to heavy volume during the Class Period;

- As a regulated issuer, Blue Ridge filed periodic public reports with the SEC and the NYSE Amex;

- Blue Ridge regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Unexpected material news about Blue Ridge was rapidly reflected in and incorporated into its stock price during the Class Period.

183.    As a result of the foregoing, the market for Blue Ridge's common stock promptly digested current information regarding Blue Ridge from all publicly available sources and reflected such information in the price of Blue Ridge's common stock. Under these circumstances, all purchasers and acquirers of Blue Ridge's common stock during the Class Period suffered similar injury through their purchase or acquisition of Blue Ridge's common stock at artificially inflated prices and the presumption of reliance applies.

184.    Further, at all relevant times, Plaintiff and all other Class members reasonably relied upon the Exchange Act Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiff and the other Class members would not have purchased or otherwise acquired Blue Ridge common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business,

Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972).

**COUNT I**
**Violations of Section 10(b) and Rule 10b-5(b)**
**Against Defendants Blue Ridge, Plum, and Gavant**

185.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

186.    Plaintiff asserts this claim against Defendants Blue Ridge, Plum, and Gavant based on Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

187.    Plum, Gavant, and Blue Ridge made the allegedly false statements contained in the Original 2022 10-K and the Q4 2022 Press Release.

188.    Defendants Plum, Gavant, and Blue Ridge, by and through Plum, Gavant, Moser, and other senior Blue Ridge officers and employees, violated §10(b) of the Exchange Actr and Rule 10b-5(b) promulgated thereunder in that they made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Defendants' statements directly affected the price of Blue Ridge common stock during the Class Period.

189.    Defendants acted with scienter in that they knew or were reckless in not knowing that the public documents and statements issued or disseminated in the name of Blue Ridge were materially false and misleading; knew or were reckless in not knowing that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

47

190.    In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Blue Ridge common stock during the Class Period in purchasing Blue Ridge common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

191.    Had Plaintiff and the other members of the Class been aware that the market price of Blue Ridge common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Blue Ridge common stock at the artificially inflated prices that they did, or at all. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(b) promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Blue Ridge common stock during the Class Period. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Blue Ridge common stock during the Class Period.

192.    This action was filed within five years of each of Defendants' fraudulent statements and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

## COUNT II
## Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

193.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

194.     During the Class Period, the Individual Defendants participated in the operation and management of Blue Ridge, and conducted and participated, directly and indirectly, in the conduct of Blue Ridge business affairs. Because of their senior positions, they knew the adverse non-public information about Blue Ridge's misstatements in the Original 2022 10-K and the Q4 2022 Press Release.

195.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Blue Ridge financial condition and results of operations, and to correct promptly any public statements issued by Blue Ridge which had become materially false or misleading.

196.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of Original 2022 10-K and the Q4 2022 Press Release, as well as other statements Blue Ridge publicly disseminated in the marketplace during the Class Period concerning Blue Ridge's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Blue Ridge to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Blue Ridge within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Blue Ridge common stock.

197.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Blue Ridge.

49

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:   June 28, 2024

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jonathan Horne*
Jonathan Horne
Laurence Rosen
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
jhorne@rosenlegal.com
lrosen@rosenlegal.com

*Lead Counsel for Plaintiff and the Class*
*Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 28, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all attorneys of record.

Respectfully submitted,

*<u>/s/ Jonathan Horne</u>*
Jonathan Horne